ROGER THOMPSON v. THE STATE.

No. 16279. Delivered November 22, 1933.
Reported in 65 S. W. (2d) 299.

The opinion states the case.

*Robert P. Brown* and *D. I. Durham,* both of San Angelo, for appellant.

*Weaver Baker,* Dist. Atty., of Junction City, *Glenn R. Lewis,* Dist. Atty., of San Angelo, and *Lloyd W. Davidson,* State's Atty., of Austin, for the State.

KRUEGER, JUDGE.—The appellant was tried and convicted of the offense of murder and his punishment assessed at confinement in the state penitentiary for a term of 50 years.

It was alleged in the indictment that the appellant killed one H. M. Poland in the county of Sterling, State of Texas, on or about the 22nd day of March, A. D. 1930. The appellant earnestly contends that the testimony adduced on the trial is insufficient to justify his conviction. The state mainly relied upon the testimony of Fred Moutray, an accomplice, and endeavored by corroborating evidence to sustain said testimony. For a clear understanding of the facts relied on by the state we deem it proper to state the testimony as reflected by the record.

Fred Moutray testified as follows:

"I am 40 years old. I have lived in Texas since 1919. In the month of March, 1930, I was living at the home of Mrs. Nina Allen in McCamey, Texas. I had been there about 2½ years. I was working in the refinery as a boiler maker. I know Mrs. Allen's daughter, whose name is now Mrs. Lawson Deck. I know the defendant, Roger Thompson. I got acquainted with him at Huntsville, Texas, in the year 1923. Some time during the latter part of February, 1930, Roger Thompson came to McCamey and went with me to the Allen boarding house. He was hunting work. He had a Model T Ford. I had a Model A Ford. About two or three weeks after he came to McCamey he and I went in my car to San Angelo, Texas. The Cattlemen's Convention was going on there then. The first and second night we stayed at the home of a friend of Mr. Thompson's but I don't remember his name. On Friday night we stayed on the creek. While at San Angelo I met Ruby Taggart whom I had known before. I met her on Friday in a cafe but do not remember whether Thompson was with me. I do not know the name of the cafe. It is located opposite the San Angelo National Bank. I first met her at Huntsville, Texas. She came up to where I was standing and asked what I was doing in San Angelo. In a few minutes after I had talked to Ruby Taggart I saw Thompson and had a conversation with

him. I told him Ruby Taggart wanted me to help her rob some Jew. I told her I did not care anything about that kind of business and asked if he wanted to do that kind of business. He said he didn't know. Thompson and I met her after that in the Walker Hotel. I had a conversation with her first when Thompson was not present and after that I saw Ruby Taggart when Thompson was with me. On that occasion she told Tommy about this Jew; that he was a gambler and supposed to have quite a lot of money on him and she asked Tommy if he would help her get this money from the Jew; they finally agreed they would rob this Jew. She was to go with this Jew up the Lubbock road the next morning and Thompson was to follow. She was going with the Jew in his car and Thompson was to follow in my car. The arrangement was that Ruby and the Jew were to leave the hotel the next morning about 7 o'clock. The next morning Thompson and I parked my automobile opposite the hotel. Pretty soon a Ford coupe with a trunk on the back drove up to the hotel and in a few minutes a negro came out carrying a grip which he put in that automobile and a few minutes later Ruby and the Jew came out. They got in the car and drove straight north and Thompson followed in my car. Later in the day I saw Ruby and Thompson. It must have been about 3 P. M. I was standing on the corner and he came up and said it was a pretty bad job. I asked him why and he said he had to kill that Jew. I asked him where the Jew was. He said he was in the back end of his automobile up on the street. He told me that when he put the gun on him he, the Jew, didn't 'go up' but reached for a six shooter. After Thompson told me this we got a couple of pints of whisky and then started for McCamey. I drove my car and Tommy drove the Jew's car. It looked like the same car I saw that morning. We went from San Angelo to McCamey. At McCamey I drove my car to Mrs. Allen's and parked it in her yard. I got a pint of whisky from a bootlegger and we then got in the Jew's car and went to the Pecos river. At the river we took the body out of the car, took the clothes off of him, and burned them, and put the body into the river. We got back to McCamey about daylight and parked the car in the yard beside mine. We then went to bed and slept until about noon. We stayed at Mrs. Allen's in McCamey until Monday afternoon when we went to Del Rio. We stopped en route to buy gasoline. We left Del Rio the next day about noon and went to Barker's ranch and stayed there that night, the next day, and next night, and then went to San Antonio, Texas. At San Antonio we met Mr. Shamberger whom I had met in the army. Mr. Shamberger,

Thompson and I went in this Jew's car to the government hospital to see George Minor whom I met in the army. We left San Antonio that night and arrived at Wichita Falls the next day before noon. At Wichita Falls we took the Arkansas license plate off of the Jew's car and put on a Kansas license plate which we obtained at a junk pile. We left Wichita Falls the next day and went to Oklahoma City by way of Greenville. At Greenville we stopped at the home of Thompson's brother about four hours. From Oklahoma City we went back to Wichita Falls and from there we went to Thayer, Kansas. From Thayer we went to Tulsa, Oklahoma, where I saw Ruby Taggart. I told Thompson I had seen Ruby and that she told me I was 'hot' in Texas; that I had better get the automobile out of the country. The things that were in the car we burned and left for Chicago. The second day in Chicago I went to work for a tank manufacturing company and Tommy took the automobile and left, going northwest. That is the last I saw of him. Thompson told me the offense was committed between Big Springs and Lamesa."

The state proved by Mr. Davis that the Cattlemen's Convention in San Angelo was on Tuesday, Wednesday, and Thursday, the 18th, 19th, and 20th of March 1930; that on Friday and Saturday they had some races at the fair grounds, a continuation of the convention.

By Mr. W. P. Rooney, the sheriff of Pecos county, the state proved that on the 25th of March, 1930, he, the said Rooney, together with other officers, took a body out of the Pecos River and had the same photographed. By Lawyer Steen, a negro porter at the Walker Hotel in San Angelo, the state proved that he knew Ruby Taggert and that in the month of March during the Cattlemen's convention Ruby was there at the hotel; that he remembered when she left the hotel. It was one morning between 8 and 9 o'clock; he put her baggage in the back end of a Ford coupe. It was a man who told him to put the baggage in there and he paid him and they left in the car.

By Mr. J. D. Findt the state proved that he was living in Sterling City in March, 1930, and owned the City Cafe; that "the picture of the dead man is the picture of a man I saw in my cafe after the convention at San Angelo broke up. There was a lady with him and they had lunch there. They came in a Ford coupe; there was a trunk on the rear of this car." By Mr. W. B. Allen the state proved in substance as follows: "I live in Sterling City and am in the confectionery business. I saw the man that is shown in the picture in my place of business. He was in a Ford coupe and there was a trunk on the

back end of the car. There was a woman with this man. I think this was the next day after the Cattlemen's convention at San Angelo. This was between 12:30 and 1 o'clock."

By Captain W. L. Wright, Texas Ranger, the state proved the following: "On the 25th day of March, 1930, I helped to get a body out of the Pecos River. The picture is a picture of the man's body that we took out of the river. There were wounds on this man's body. One of the wounds being located in his back right under the left shoulder blade and came out in front close to his nipple. The other wound was in the top of his head. It went through the skull. I inspected the bank of the river at the place where the body was found and we saw tracks of a car and found where there had been a fire built. The first time I saw Roger Thompson was in October, 1932, at Walla Walla, Washington."

The state proved by Dr. W. B. Everett, a practicing physician in Sterling City, that a bullet entered right under the left shoulder blade and came out just to the left of the breast bone. "The bullet would hit some part of the heart and he would not live over a minute or two." By Mrs. Deck the state proved that in March, 1930, Mr. Moutray was boarding with her mother in McCamey and Mr. Thompson boarded there also for 4 or 5 weeks. He and Moutray left there. They left one time together and they came back and stayed two or three days. When they left the last time it was either on Monday about noon or Tuesday. They came in on Saturday night. There were several cars at the house; Moutray had a Ford roadster and Thompson had a Model T coupe; they left either Monday or Tuesday in a Ford coupe. It was neither the car owned by Moutray or Thompson; the first time the witness saw that car was on Sunday morning. It was parked in the yard. When Moutray left, his roadster was not quite paid for and he was to send the witness money back to finish paying for it. The Model T Ford was left by Thompson to be disposed of to pay for his board. Mrs. Allen testified as follows: "In March, 1930, I was running a boarding house. Fred Moutray was staying at my house and Mr. Thompson came to my house and stayed three or four weeks. The last time Mr. Moutray left Mr. Thompson went with him. I believe it was Tuesday when they left the last time. The first time I saw that car they left in was on Sunday morning. They came in some time during Saturday night. I did not see them any more after they left." By Mr. J. E. Simco the state proved: "I operate an ice plant in McCamey across the street from Mrs. Allen's boarding house. I know Fred Moutray. I have seen Moutray a number of times prior to the

time I saw Mr. Thompson. Mr. Moutray had a car and Tommy had a car. On Saturday or Sunday morning there was another Ford coupe, a strange car. It didn't have a Texas license but I could not say what license it had on it."

By Mr. Shamberger the state proved that Fred Moutray and Roger Thompson came to see him March 27, 1930, in San Antonio, Texas; that they went to the hospital to see George Minor; they went out there in Mr. Moutray's car, a Ford coupe; they stayed there about two hours and Moutray, Thompson and the witness went back to his room and they all shaved and cleaned up and then went to a cafe and ate supper and after supper Moutray and Thompson left.

The state proved by George Minor that he was in the hospital in San Antonio during the month of March and April, 1930, and while there saw Mr. Moutray. Moutray, Mr. Shamberger, and another man whose name he did not remember were there.

By Mr. Bascom Benton the state proved that during the month of March, 1930, he was employed by the Baker-Hemphill department store in San Angelo; during said month he met a man named Poland. He came into the store and purchased $25 worth of hose and neckwear. He came back the following day and bought $28 worth of fine underwear and handkerchiefs. The first day's purchase he paid from an immense roll of currency from his pocket and the second day's purchase he paid from a leather note book that he carried on the inside of his pocket. "This picture is a picture of the man I am speaking about. I sold him this merchandise during the Cattlemen's convention."

By Mr. Crist the state proved: "During the month of March, 1930, I met a Mr. Poland, his initials were H. M. I saw him from Monday up to Friday. I was in the tailoring business in San Angelo and he came in and bought some clothes from me during the Cattlemen's convention. I later saw his body at Fort Stockton and this picture is a picture of Mr. Poland, the man to whom I sold the clothes. He had a roll of money in his pant's pocket and he had a purse. The last time I saw him was on Friday morning about 9 o'clock."

The above and foregoing constitutes the entire testimony. As we understand the testimony the salient and incriminating facts are as follows: Miss Ruby Taggart had heard that Mr. Poland was supposed to have considerable money on his person; that she and the appellant conspired to rob him and in pursuance of the conspiracy she induced the deceased to take her in a car some distance out of San Angelo; that the appellant

was to follow in the witness' car and at some appropriate spot would rob the deceased; that Ruby Taggart on Friday morning, between 8 and 9 o'clock, left in a car with the deceased and drove north leading in the direction of Lubbock and Sterling City. The deceased was seen in Sterling City Friday noon together with a woman, who, however, was not identified as Ruby Taggart; that in the afternoon on the same day at 3 P. M. Ruby Taggart and the appellant reappeared at San Angelo where the witness Fred Moutray inquired of the appellant what had become of the Jew and the appellant replied that he had to kill him and he had him in the back end of his automobile. That later that evening they left San Angelo, and drove to McCamey and then from McCamey to the Pecos River where they stripped the body of the clothes, burned the clothes, and threw the body into the Pecos River, returning to McCamey just before daylight on Sunday morning; that on Monday afternoon they left for Del Rio, from Del Rio to Barker's ranch, where they remained two nights and one day, then to San Antonio where they ate supper and visited with Mr. Shamberger and Mr. Minor, and then drove to Wichita Falls, where they took the Arkansas license plate off of the Ford coupe and put on a Kansas license plate; then they went from Wichita Falls to Oklahoma City by way of Greenville, from Oklahoma City they went back to Wichita Falls, and from there to Thayer, Kansas, and from Thayer, Kansas, to Tulsa, Oklahoma, where the witness Fred Moutray saw Ruby Taggart, who told him that he was "hot" in Texas and had better get rid of the automobile, whereupon they left for Chicago.

Viewing this testimony from the standpoint of the state in its strongest light, are there any facts and circumstances which corroborate the testimony of the accomplice Fred Moutray on any of the salient and incriminating facts? If so we have failed to discover it. There is no testimony in the record showing that anyone saw the appellant and the witness Moutray in the city of San Angelo. There is no testimony in the record outside of the testimony of the accomplice that Ruby Taggart and the appellant had entered into a conspiracy to rob Mr. Poland. There is no testimony in the record outside of that of the accomplice showing that the appellant, in a car, followed Ruby Taggart and a man leaving San Angelo in an automobile. There is no testimony outside of the accomplice's testimony that the appellant returned to San Angelo in the deceased's car with the deceased's body in the back end of the automobile. There is no testimony in the record outside of that of the accomplice showing that the deceased was in San Angelo on Friday, the day

of the alleged homicide. There is no testimony in the record outside of that of the accomplice that the appellant and the accomplice went from San Angelo to McCamey on Saturday night carrying the dead body with them, nor is there any testimony outside of that of the accomplice that the appellant and the accomplice went from McCamey to the Pecos River with the dead body in the back of the car and there stripped the body of deceased of his clothes, threw him in the river, and burned his clothes. There is testimony, however, that the deceased was found in the Pecos River and that there had been a fire on the bank of the river and that on Sunday morning the appellant and the accomplice appeared at the home of Mrs. Allen, remained there until Monday afternoon, when they both left in a Ford coupe, and that they appeared at San Antonio together in a Ford coupe, but there is no testimony whatever in the record that the Ford coupe which they were driving was the Ford coupe that belonged to the deceased. There is no testimony in the record except that of the accomplice that they drove in this Ford coupe to Wichita Falls, from Wichita Falls to Oklahoma City, from Oklahoma City to Thayer, Kansas, and from Thayer, Kansas, to Tulsa and from Tulsa to Chicago.

The law provides that a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense. It is not necessary that the corroborating fact or evidence should be such as to show the guilt of the accused independently of the evidence of the accomplice. However, the law does demand that the corroboration must with some degree of probative force tend to connect the accused with the salient criminative facts. We do not find any testimony in the entire record independent of that of the accomplice which tends to connect the appellant with the commission of the offense. From the light of the record before us the conclusion could reasonably be reached that the accomplice committed the offense himself or in connection with Ruby Taggart. The only testimony which even casts a suspicion upon the appellant's connection with or knowledge of the offense is his apparent flight. However, this alone is not sufficient to connect the defendant with the alleged offense, and in support of our views we cite the following cases, to-wit: Millican v. State, 7 S. W. (2d) 82; Stephens v. State, 19 S. W. (2d) 43; Johnson v. State, 208 S. W., 170; Cattrell v. State, 240 S. W., 313.

By reason of the failure on the part of the state to suffi-ciently corroborate the accomplice on the salient criminative facts, the judgment of the trial court is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.